IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

RENEE JENNINGS, *et al.*,

    Plaintiffs,

       v.                 CIVIL NO.: WDQ-13-2164

HOUSING AUTHORITY OF
  BALTIMORE CITY, *et al.*,

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Renee Jennings[1] sued the Housing Authority of Baltimore City ("Housing Authority"),[2] Paul T. Graziano, Chief Executive of the Housing Authority, and Reginald Scriber, Deputy Commissioner for the Housing Authority,[3] claiming the defendants illegally terminated her participation in the Housing Authority's voucher program. ECF No. 2. Pending is the defendants' motion to

---

[1] Jennings sued individually and as mother and next friend of her minor son, "DC." *See* ECF No. 2 at 1, 8. Jennings's daughter, Tyniquia Jones, who is not a minor, is also a named plaintiff. *See id.*

[2] The Housing Authority is allegedly "a body corporate and politic and a political subdivision of the State of Maryland." ECF No. 2 ¶ 4.

[3] Graziano is sued in his official capacity, while Scriber is sued in his official and individual capacities. ECF No. 2 at 2. Graziano is allegedly "responsible for overseeing [the Housing Authority] actions complained of in this complaint, and held a supervisory responsibility over the [Housing Authority] employees." *Id.* ¶ 5.

dismiss for failure to state a claim or for a more definite statement.[4]   ECF No. 11.   No hearing is necessary.   Local Rule 105.6 (D. Md. 2011).   For the following reasons, the motion to dismiss will be granted.

I. Background[5]

The Housing Authority administers the federally funded Section 8 Housing Choice Voucher ("HCV") program, which provides rent subsidies to low-income tenants in Baltimore City.   *See* ECF No. 2 ¶¶ 4, 8, 21-22.   As of about September 2011, Jennings participated in the HCV program, which enabled her and two of her three children (Jones and DC) to live in a home at 3407 Royston Avenue in Baltimore (the "Royston home") that cost $1,700 per month to rent.   *See id.* ¶¶ 9-10, 22.

Jennings's adult child, James Barrett, Jr., has been imprisoned since 2011, and is accordingly "ineligible to

---

[4] Also pending is Jennings's motion for leave to file attachments to her response in opposition to the motion to dismiss.   ECF No. 17.   She had intended to file these documents with her response but realized a few days after filing that she had neglected to attach them.   *See id.*   As the defendants have stated that they do not oppose Jennings's motion, it will be granted.   *See* ECF No. 18 at 1.

[5] For the motion to dismiss for failure to state a claim, the well-pled allegations in the complaint are accepted as true. *See Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011). In reviewing the motion to dismiss, the Court may consider allegations in the complaint, matters of public record, and documents attached to the motion to dismiss that are integral to the complaint and authentic.   *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

participate in the HCV Program." *Id.* ¶ 12.  He has never "lived
at, visited, [or] been a 'family member' or a 'household member'
of 3407 Royston Avenue." *Id.* ¶ 11.

In April 2012, Housing Authority employees allegedly
contacted Jennings's landlord, Dominion Properties, LLC
("Dominion"), and "compelled" Dominion to "fraudulently modif[y]
the lease agreement for" the Royston home, by adding Barrett "to
the list of tenants residing at" the Royston home without
Jennings's "written permission." *Id.* ¶¶ 78-79.

In early May 2012,[6] the Housing Authority notified Jennings
that her participation in the HCV program would be terminated
effective June 5, 2012. *See id.* ¶¶ 9, 13.  The notice advised
Jennings that the reasons for the termination included "a 2010
incident of domestic violence of which Ms. Jennings was the
victim[,] and two 2010 incidents of criminal activity by"
Barrett.  *Id.* ¶ 14.  Following the termination, Dominion
"refused to accept [her] rental payments, citing [the]
termination of assistance letter." *Id.* ¶ 18.

Jennings "opted to participate in an informal hearing," on
May 29, 2012, to challenge the termination. *See id.* ¶¶ 15-16,
53.  Jennings was not represented by counsel. *Id.* ¶ 17.  The

---

[6] Jennings alleges in one paragraph that she received the notice
on May 4, 2012 and in another paragraph that she received it
"[o]n or about May 6, 2012." ECF No. 2 ¶¶ 9, 13.

hearing administrator affirmed the termination decision.[7] *See id.* ¶ 58.  The administrator told Jennings that "'there is no appeal you can take from today's hearing,'" which was allegedly a "lie[]" because Jennings had the "right to an Administrative Mandamus." *See id.* ¶¶ 57-58.  On June 7, 2012, the Housing Authority terminated Jennings's participation in the HCV program.  *Id.* ¶ 18.

On June 19, 2012, Jennings and Jones met with Scriber to discuss Jennings's "dissatisfaction with the informal hearing process" and the termination of her assistance.  *Id.* ¶ 19. Scriber[8] told Jennings "in front of [Jones], members of the general public[,] and [his] secretary," that she was a "'disgrace to society, a disruption to the community, the worst things that ever lived in section 8,[9] and you should teach your kids how to stop ruining your life; and, if I could help you, which I can, I wouldn't help you.  My decision stands.  Good bye

---

[7] The hearing notice allegedly "failed to include a written statement of appeal rights with the decision as required by law."  ECF No. 2 ¶ 56.

[8] Scriber allegedly "intentionally denied Plaintiffs their procedural due process rights, under Article 24 of the Maryland Declaration of Rights."  ECF No. 2 ¶ 6.

[9] "Section 8" refers to the HCV program, which was established by the federal Housing Act.  *See* ECF No. 2 ¶ 4; 42 U.S.C. § 1437 *et seq.* (1974).

Ms. Jennings.'"[10]  *Id.* ¶¶ 20, 87.  He also "intentionally lied"
to Jennings "about her procedural rights" to appeal the result
of the informal hearing by "Judicial Review or Administrative
Mandamus in the Circuit Court" by telling her "'there is nothing
more to do.'" [11]  *Id.* ¶ 70.

The Housing Authority "did not pay any portion of the rent
for" the Royston home for July, 2012.  *Id.* ¶ 21.  On July 16,
2012, Dominion sued Jennings "for distress of rent" in the
District Court for Baltimore City, alleging that Jennings owed
$1,700 in rent for July.  *Id.* ¶ 22.  On August 2, 2012, Dominion
sued Jennings again, alleging that Jennings owed $1,700 for
August.[12]  *Id.* ¶ 23.  On August 31, 2012, Dominion served
Jennings with an eviction notice.  *Id.* ¶ 25.

---

[10] Jennings alleges that Scriber acted "intentional[ly]," and
caused her "nightly unpleasant mental reactions, such as fright,
horror, grief, shame, embarrassment, anger, chagrin,
disappointment, worry, nausea and severe emotional distress."
ECF No. 2 ¶ 88.

[11] Jennings alleges that her "Administrative Mandamus right
expired 30 days after her informal hearing, on June 28, 2012."
ECF No. 2 ¶ 71.  She also alleges that "[i]n furtherance of said
agreement or by individual actions" taken in the scope of
employment, the "Defendants' intentional lies and omissions
during the termination process[] prevented [her] from appealing
the . . . informal hearing to the Circuit Court for Baltimore
City . . . under Maryland Rule[s] 7-401 and 7-201."  *See id.* ¶¶
59-60.

[12] In the July suit, Dominion alleged that the Royston home was
subsidy housing, but in the August suit, Dominion alleged that
it was not subsidy housing.  *See* ECF No. 2 ¶¶ 22-23.

On September 27, 2012, the August rent distress case was tried. *Id.* ¶¶ 24, 26. Dominion, allegedly "at the insistence" of the Housing Authority, "intentionally misrepresented" to the court that Jennings owed it $3,400 in rent for July and August. *Id.* ¶ 80. The Housing Authority appeared and argued, over objection from Jennings's counsel, that, because they had terminated Jennings's participation in the HCV program, the Housing Authority's rent obligation for the Royston home had "shifted to Ms. Jennings."[13] *See id.* ¶ 26. As a result of Dominion and the Housing Authority allegedly "knowingly and intentionally present[ing] false information to the Maryland District Court," the court ruled for Dominion. *See id.* ¶ 82.

On October 2, 2012, Dominion evicted Jennings, Jones, and DC from the Royston home. *Id.* ¶ 28. In "illegal[ly] terminati[ng]" her assistance, and "render[ing Jennings and her children] homeless," the defendants allegedly acted with "deliberate indifference to[, *inter alia,*] the established rights of the Plaintiffs." *See id.* ¶¶ 29-30. Further, "as a result of Defendants' illegal actions," Jennings and her children were "disgraced and humiliated . . . through the

---

[13] The Housing Authority's participation in the trial allegedly amounted to "bullying and thug tactics" designed to ensure "Plaintiffs lost their right to negotiate a new lease for" the Royston home. ECF No. 2 ¶ 81.

eviction process before their neighbors, friends and family from Royston Ave." *Id.* ¶ 89.

On July 16, 2013, Jennings, through counsel, filed suit in the Circuit Court for Baltimore City alleging that the defendants had: (1) illegally terminated assistance to a victim of domestic violence, in violation of the Housing Authority's Administrative Plan (the "Administrative Plan") and the Fair Housing Act ("FHA")[14] (count one); (2) terminated assistance based on "non-actionable conduct and unauthorized grounds,"[15] in violation of the Administrative Plan and 24 C.F.R. § 5.2005(c)[16] (count two); (3) conspired to interfere with the plaintiffs' right to a "contested case," in violation of Maryland's Administrative Procedure Act ("APA")[17] (count three); (4) denied a statutory entitlement without due process, in violation of the Maryland Declaration of Rights, Article 24 (count four); (5)

---

[14] 42 U.S.C. § 3601 *et seq.* (1968).

[15] Jennings alleges that the defendants could not base their termination decision on the actions of Barrett, because he does not qualify as a "family member[]" bound by the "Family obligations clause of the Section 8 [HCV] Program contract for" the Royston Home. *See* ECF No. 2 ¶¶ 45-46.

[16] Regulations under "[t]his subpart address[] the protections for victims of domestic violence, dating violence, or stalking residing in public and Section 8 housing, as provided in the 1937 [Housing] Act, as amended by the Violence Against Women Act (VAWA) (42 U.S.C. 1437f and 42 U.S.C. 1437d)." 24 C.F.R. § 5.2001.

[17] Md. Code Ann., State Gov't § 10-101 *et seq.* (West 2012).

conspired with Dominion to interfere "with [her] economic relationship" (count five); and (6) intentionally inflicted emotional distress (count six).[18]   ECF No. 2.   On July 26, 2013, the defendants removed to this Court on the basis of federal question jurisdiction.   ECF No. 1.

On August 23, 2013, the defendants moved to dismiss for failure to state a claim: (1) counts three through six as to all defendants; (2) all claims for punitive damages; and (3) counts one and two as to Graziano and Scriber.[19]   *See* ECF No. 11-1 at 21.   On September 10, 2013, Jennings opposed the motion.[20]   ECF Nos. 15-16.   On September 27, 2013, the defendants replied.   ECF No. 18.

---

[18] For each count, Jennings seeks $1,000,000 in compensatory damages and $1,000,000 in punitive damages against the defendants, jointly and severally.   *See, e.g.*, ECF No. 2 at 10. She also demands a jury trial.   *Id.* ¶ 7.

[19] The defendants have not moved to dismiss counts one and two against the Housing Authority, except as to Jennings's claim for punitive damages.   *See* ECF No. 11-1 at 21.

[20] In her opposition, Jennings construes the defendants' motion as one for summary judgment, presumably because the defendants have attached a copy of the Administrative Plan to the motion. *See* ECF Nos. 11-2, 16 at 4-5.   However, in reviewing the defendants' motion to dismiss, the Court may consider attached documents that are integral to the complaint and authentic.   *See Philips*, 572 F.3d at 180.   Jennings does not dispute the authenticity of the attached Administrative Plan, and her complaint asserts violations of the Administrative Plan.   *See* ECF Nos. 2 at 8-12, 16 at 4-5.   The motion is properly considered as a motion to dismiss.

II.  Analysis

A. Legal Standard for Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001).  Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003).  These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability;'" the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

9

(2009) (*quoting Twombly*, 550 U.S. at 557).  The complaint must not only allege but also "show" that the plaintiff is entitled to relief.  *Id.* at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief."  *Id.* (internal quotation marks and alteration omitted).

B. Violation of Maryland's APA

In Count Three, Jennings alleges that she had the right to a "contested case" procedure under the APA before her housing assistance was terminated, and the "informal hearing" she was granted lacked several of the APA's required procedural protections.  *See* ECF No. 2 at 13.  She also alleges that the defendants interfered with her rights under the APA in several ways, including lying about her appeal rights.  *See id.*  The defendants contend that the Housing Authority "is not an agency bound by Maryland's" APA.  *See* ECF No. 11-1 at 5.  Jennings responds that the rights provided by the APA's contested case procedure are not "afforded only to those whose benefits are administered through a Housing Agency that happens to be a part of the State Government."  ECF No. 16 at 8-9.

Under Maryland's APA, a "contested case" is "a proceeding before an *agency* to determine," *inter alia*, "a right, duty, statutory entitlement, or privilege of a person that is required

10

by statute or constitution to be determined only after an
opportunity for an agency hearing."  Md. Code Ann., State Gov't
§ 10-202(d)(1) (West 2012) (emphasis added).  An agency is
defined as either: (1) "an officer or unit of the State
government authorized by law to adjudicate contested cases; or
(2) a unit that[] is created by general law[,] operates in at
least 2 counties;[21] and []is authorized by law to adjudicate
contested cases."  *Id.* § 10-202(b).

Although Maryland courts have not yet addressed whether the
Housing Authority is a "state agency" for purposes of the APA,
Maryland courts have held that, for purposes of state tort
liability, the Housing Authority is a local, not state, agency.
*See Mitchell v. Hous. Auth. of Baltimore City*, 200 Md. App. 176,
189-90, 26 A.3d 1012, 1020 (2011); *see also Sager v. Hous.
Comm'n of Anne Arundel Cnty.*, 855 F. Supp. 2d 524, 568 (D. Md.
2012) (concluding that Maryland housing authorities were not
state agencies for purposes of § 1983 liability, because
"although the Court is unaware of a case expressly deciding
whether Maryland housing authorities are state agencies, it is
by no means unprecedented for Maryland housing authorities to be

---

[21] Jennings does not dispute the defendants' contention that the
Housing Authority only operates in Baltimore City.  *See* ECF No.
11-1 at 6.

sued under § 1983").[22]  Accordingly, Maryland courts would likely hold that the Housing Authority is similarly a local, rather than state, agency for purposes of the APA.  Because the Housing Authority is not an "agency" under the APA, Jennings did not have a right to the APA's contested case procedures to challenge the termination of her benefits[23] nor could the defendants be liable for conspiring to interfere with those procedures.[24] Count Three will be dismissed.

---

[22] *But see Walker v. Dep't of Hous. & Cmty. Dev.*, 422 Md. 80, 92, 29 A.3d 293, 300 (2011) (finding that the APA's contested case procedures applied to termination of Section 8 benefits, when the "parties [were] in agreement that the [Department of Housing and Community Development] is a State agency to which the APA applies").

[23] *Cf. Warwick Corp. v. Dep't of Transp.*, 61 Md. App. 239, 245, 486 A.2d 224, 227 (1985) (noting that the first step in determining whether a matter is a "contested case" under the APA is whether the entity "qualifies as an agency that was intended to be included within the coverage of the APA"); *Beretta U.S.A. Corp. v. Santos*, 122 Md. App. 168, 181, 712 A.2d 69, 75 (1998) *rev'd sub nom. on other grounds Prince George's Cnty. v. Beretta U.S.A. Corp.*, 358 Md. 166, 747 A.2d 647 (2000) (finding that the APA did not authorize judicial review of a decision of the Prince George's County Human Relations Commission, because the Commission was not within the APA's definition of "agency"); *Skydiving Ctr. of Greater Washington, D.C., Inc. v. St. Mary's Cnty. Airport Comm'n*, 823 F. Supp. 1273, 1279 n.2. (D. Md. 1993) (dismissing claims for violations of Maryland's APA, because the defendants were not "agencies" under the APA).

[24] *See, e.g., Van Royen v. Lacey*, 262 Md. 94, 99, 277 A.2d 13, 15 (1971) (dismissing unsecured creditor's conspiracy claim when defendants unlawfully conspired to a fraudulent transfer of property in which the creditor had "no legal right or interest").

C. Due Process

In Count Four, Jennings alleges that, after the informal hearing had concluded, the hearing officer and Scriber "lied to [her] about her procedural rights to a Judicial Review or Administrative Mandamus in the Circuit Court." ECF No. 2 ¶¶ 67-68, 70. As a result, Jennings did not seek review of the termination decision. *See id.* ¶¶ 70, 74. Jennings alleges that these actions denied her due process under Article 24 of the Maryland Declaration of Rights.[25] *See id.* at 15-17. The defendants contend that "Plaintiffs admit they challenged the termination decision and were afforded an informal hearing . . . . Beyond issuing a decision, there are no further requirements." ECF No. 11-1 at 11.

Procedural due process under Article 24 of the Maryland Declaration of Rights requires the government to provide "notice and some form of hearing or opportunity to respond" before depriving individuals of property. *See VNA Hospice of Maryland v. Dep't of Health & Mental Hygiene*, 406 Md. 584, 603, 961 A.2d 557, 568 (2008) (*citing*, *inter alia*, *Goldberg v. Kelly,* 397 U.S.

---

[25] Article 24 states "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Declaration of Rights, art. 24.

254, 268-271, 90 S. Ct. 1011, 1020-1022, 25 L.Ed.2d 287, 299-301 (1970)).[26]

Due process requires a housing authority to abide by the requirements of *Goldberg*, 397 U.S. at 266-71, 90 S. Ct. at 1019-22, before terminating housing benefits:

> (1) timely notice from the housing authority stating the basis for the proposed termination, (2) an opportunity by the tenant to confront and cross-examine each witness relied on by the housing authority, (3) the right of the tenant to be represented by counsel, (4) a decision, based solely on evidence adduced at the hearing,[27] in which the

---

[26] "[A]rticles 19 and 24 of the Maryland Declaration of Rights [are] the State law counterparts to the due process clause of the Fourteenth Amendment," and have "long been held to provide the same, but no greater, rights and protection." *Durham v. Fields,* 87 Md. App. 1, 9, 11, 588 A.2d 352, 356-57 (1991).

[27] In her opposition, Jennings contends that she was denied due process "when Defendants failed to base their informal hearing decision on facts based solely on evidence adduced at the hearing." *See* ECF No. 16 at 15. She does not, however, allege any facts in the complaint to support this claim. In their reply, the defendants assert that they did not move to dismiss this claim, and do not object to Jennings pursuing it, if she provides a more definite statement of the claim. *See* ECF No. 18 at 2 & n.1, 8-9. Federal Rule of Civil Procedure 12(e) provides that a "party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." The defendants do not argue that Jennings's pleadings as to this claim are vague; they contend that they are absent. *See* ECF No. 18 at 8-9. Accordingly, Rule 12(e) relief is inappropriate. *See Piasecki v. Wal-Mart Stores E., LP*, 2:08-CV-01302, 2009 WL 8626849, at *3 n.2 (S.D.W. Va. Feb. 20, 2009) (Rule 12(e) relief inappropriate when "plaintiff's claims are inadequate because of her failure to provide specific facts as required by *Twombly* and not because her pleading was vague, ambiguous, or otherwise unintelligible"). If Jennings wishes to challenge her informal hearing on these due process grounds, she

reasons for the decision are set forth, and (5) an impartial decision maker.

See *Clark v. Alexander*, 85 F.3d 146, 150-51 (4th Cir. 1996).

The complaint does not allege that the notice or informal hearing Jennings received from the Housing Authority failed to comply with *Goldberg*. Instead, it alleges that, by lying to her about her right to seek review of the hearing officer's decision, Jennings was denied due process. *See* ECF No. 2 ¶¶ 67-68, 70. However, "[t]he right to an appeal is not a right required by due process of law, nor is it an inherent or inalienable right." *Criminal Injuries Comp. Bd. v. Gould*, 273 Md. 486, 500, 331 A.2d 55, 64 (1975) (*citing Lindsey v. Normet*, 405 U.S. 56, 92 S. Ct. 862, 31 L.Ed.2d 36 (1972)). Jennings could have sought review of the termination of her assistance by administrative mandamus after the informal hearing concluded, even if no statute provided her a right of appeal. *See Reese v. Dep't of Health & Mental Hygiene*, 177 Md. App. 102, 144 n.21, 934 A.2d 1009, 1033 n.21 (2007). However, if she was afforded the procedural protections outlined in *Goldberg*, she was not denied due process, even if Housing Authority employees erroneously told her she could not seek further review of the termination. *See, e.g., Montgomery v. Hous. Auth. of Baltimore*

---

must seek leave to file an amended complaint that properly states this claim.

*City*, 731 F. Supp. 2d 439, 442 (D. Md. 2010) (plaintiff was not likely to succeed on merits of claim that she was denied due process by the Housing Authority's refusal to allow her to record the hearing when she did not allege that the termination hearing lacked *Goldberg* protections); *Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1002-04 (4th Cir. 1970) ("Given the premise that the due process clause applies [to the termination of subsidized housing benefits], *Goldberg* also defines the scope of its application."). Count Four will be dismissed. [28]

---

[28] In Count Four, Jennings also contends that the defendants violated her due process rights, because her right to seek review by administrative mandamus expired after her assistance was terminated, in violation of 24 C.F.R. § 966.4. *See* ECF Nos. 2 ¶¶ 71-72, 16 at 2. The relevant section provides that "[w]hen the [Public Housing Authority] is required to afford the tenant the opportunity for a hearing . . . concerning the lease termination . . . the tenancy shall not terminate . . . until the . . . grievance process has been completed." 24 C.F.R. § 966.4(l)(3)(iv). However, these regulations apply only to "public housing." *See* 24 C.F.R. § 966.1. Jennings alleges that she participated in the federal Section 8 voucher program, as administered by the Housing Authority, which is governed by different regulations from the public housing program. *See* ECF No. 2 ¶¶ 8, 66; 24 C.F.R. § 982.2 ("Part 982 is a unified statement of program requirements for the tenant-based housing assistance programs under Section 8 of the United States Housing Act of 1937 (42 U.S.C. 1437f). The tenant-based programs are the Section 8 tenant-based certificate program and the Section 8 voucher program.").

D. Tort Claims[29]

    1. Intentional Infliction of Emotional Distress
       ("IIED")

The defendants argue that Jennings fails to state a claim

for IIED, and her "injuries arise from the eviction for failure

to pay Dominion's rent, not from the comments of [the Housing

authority's] employees or Scriber."  *See* ECF No. 11-1 at 15-18.

Jennings contends that the defendants' conduct was extreme and

outrageous, because of "the power Defendants' wielded with

regard to Plaintiffs['] continued right to affordable and safe

housing."  ECF No. 16 at 18.

    To state a claim for IIED, the complaint must show that the

defendant intentionally or recklessly engaged in conduct that

was extreme and outrageous, and the wrongful conduct caused the

plaintiff severe emotional distress.  *Batson v. Shiflett,* 325

Md. 684, 733, 602 A.2d 1191, 1216 (1992).  The conduct must be

"so extreme in degree, as to go beyond all possible bounds of

---

[29] Maryland applies the rule of *lex loci delicti* to determine the
law to apply in tort cases, such as IIED and tortious
interference.  *See, e.g., Philip Morris Inc. v. Angeletti*, 358
Md. 689, 750, 752 A.2d 200, 233 n.28 (2000); *B-Line Med., LLC v.
Interactive Digital Solutions, Inc.*, 209 Md. App. 22, 49, 57
A.3d 1041, 1057 (2012).  Under that rule, the court applies the
law of the state "where the injury—the last event required to
constitute the tort-occurred."  *Lab. Corp. of America v. Hood,*
395 Md. 608, 615, 911 A.2d 841, 845 (2006).  All the events at
issue in this suit allegedly took place at the Housing
Authority, the Maryland District Court, and the Royston home,
which are all located in Maryland.  *See, e.g.*, ECF No. 2 ¶¶ 4,
9, 80.  Thus, Maryland law governs Jennings's tort claims.

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 734, 1216.[30]   Each element "must be satisfied completely before a cause of action will lie." *Hamilton v. Ford Motor Credit Co.,* 66 Md. App. 46, 502 A.2d 1057, 1063 (Md. Ct. Spec. App. 1986).   "IIED claims are rarely viable in a case brought under Maryland law." *Takacs v. Fiore,* 473 F. Supp. 2d 647, 652 (D. Md. 2007) (internal quotation marks omitted).

Jennings alleges that Scriber's comments to her were intentional and "extreme and outrageous."[31]   ECF No. 2 ¶ 88.

---

[30] For example, a doctor knowingly exposed a nurse to an incurable sexually transmitted disease without warning her, a psychologist treating a patient for marital problems had sex with the client's wife, and an insurer forced a claimant to undergo a psychiatric examination for the sole purpose of harassing her and forcing her to abandon her claim or commit suicide.   *Batson*, 325 Md. at 734, 602 A.2d at 1216 (*citing Figueiredo-Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991); *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988); *Young v. Hartford Accident & Indemnity,* 303 Md. 182, 492 A.2d 1270 (1985)).

[31] Jennings also broadly alleges that the Housing Authority's "employees' individual and/or concerted conduct amounted to both harmful and offensive contact with Plaintiffs."   ECF No. 2 ¶ 86. This conclusionary allegation, without identifying the specific conduct she is referring to, is insufficient to create more than "the mere possibility of misconduct." *See Iqbal*, 556 U.S. at 679.   Similarly, Jennings alleges that "as a result of Defendants' illegal actions," she and her children were "forced into homelessness through the eviction process."   ECF No. 2 ¶ 89.   However, she does not identify which of the defendants' allegedly illegal actions were "extreme and outrageous." Further, although the Housing Authority's termination of her assistance was undoubtedly the primary cause of her eviction, she alleges that *Dominion*, not the defendants, actually evicted

Although the alleged comments are offensive, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to support a claim for IIED, especially when, as here, the comments are made by a stranger. *See Figueiredo-Torres*, 321 Md. at 655-56, 584 A.2d at 76 (*quoting Harris v. Jones*, 281 Md. 560, 569-71, 380 A.2d 611, 615-16 (1977) (internal quotations omitted)).[32]

Jennings contends that Scriber's comments were nonetheless sufficient to support a claim, because he had power over her. *See* ECF No. 16 at 18-19. Although the "defendant's position of power over a plaintiff may enhance his or her ability to do harm," and in some cases persons such as "police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position," such actors are still not liable "for mere insults, indignities, or annoyances that are not extreme or outrageous." *See Kentucky Fried Chicken Nat. Mgmt. Co. v. Weathersby*, 326 Md. 663, 690-96, 607 A.2d 8, 21-16 (1992) (concluding that, although the employer

---

her, which caused "disgrace[] and humiliat[ion] . . . before their neighbors, friends and family." *Id.* ¶¶ 28, 89.

[32] *See also, e.g., Penhollow v. Bd. of Comm'rs for Cecil Cnty.*, 116 Md. App. 265, 299, 695 A.2d 1268, 1286 (1997) (noting that the court had denied an IIED claim when the plaintiff's fiancée told her "that she was a financial burden and that she was going to die," while she was undergoing treatment for breast cancer, and her fiancée's brother called her a "bitch," "whore," and a "one breasted woman") (*citing Miller v. Ratner,* 114 Md.App. 18, 688 A.2d 976 (1997)).

was in "a unique position to affect the" employee's interests, there was no IIED liability for harassing and unfairly demoting employee). When Scriber made the comments to Jennings, her assistance had already been terminated and her informal hearing concluded. *See* ECF No. 2 ¶¶ 16-19. Accordingly, although Scriber's words were insulting, Jennings does not allege that he was responsible for her principal injury--the termination of her assistance--even if he was in a position of power. Scriber's conduct is not sufficiently extreme and outrageous to support an IIED claim; Count Six will be dismissed.

### 2. Civil Conspiracy and Interference with Economic Relationship

The defendants contend that Jennings "fail[s] to allege any specific facts to indicate that [the Housing Authority's] purpose in terminating her was intended both to wrongfully terminate her from the HCV program and to terminate her lease with Dominion." ECF No. 11-1 at 13. They also argue that Jennings fails to sufficiently allege that the defendants used "unlawful means" to achieve any alleged "improper purpose." *See id.* at 13-14. Jennings asserts that, although the parties have not yet engaged in formal discovery, she has sufficiently alleged "two specific instances where [Housing Authority employees] deliberately interfered with the economic

relationship of Plaintiffs . . . and Dominion . . . by misleading the Maryland District Court."  ECF No. 16 at 15.

In Maryland, tortious interference encompasses two causes of action: "inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *K & K Mgmt., Inc. v. Lee,* 316 Md. 137, 154-55, 557 A.2d 965, 973 (1989) (internal quotation marks and citations omitted).

To state a claim for interfering with economic relations, a plaintiff must show:

> (1) Intentional and wil[l]ful acts; (2) calculated to cause damage to the plaintiff[] in [her] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant[] (which constitutes malice); and (4) actual damage and loss resulting.

*Id.* at 155, 973.

To state a claim for inducing breach of contract, the complaint must show that

> (1) a contract or legally protected interest existed between the plaintiff and a third party; (2) the defendant knew of the contract; (3) the defendant intentionally induced the third party to breach or otherwise rendered performance of the contract impossible; (4) the interference was wrongful or without justification; (5) the contract was subsequently breached or terminated by the third party; and (6) the plaintiff suffered damages as a result.

*Prudential Real Estate Affs., Inc. v. Long & Foster Real Estate, Inc.*, 208 F.3d 210 (table), 2000 WL 248180, at *3 (4th Cir. 2000); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 503, 665 A.2d 297, 313 (1995).[33]

### a. Lease Modification

Jennings first alleges that the Housing Authority "induce[d]" Dominion to "fraudulently modif[y]" her lease to add Barrett "to the list of tenants." ECF No. 2 ¶¶ 78-79. Jennings does not allege that this action "induced [Dominion] to breach" the lease or "rendered . . . impossible" performance of the lease. *See Macklin*, 334 Md. at 301-02, 639 A.2d at 119 ("[T]o be actionable, the improper or wrongful conduct must induce the breach or termination of the contract."). Instead, her allegations suggest that the lease ended because Jennings did not pay Dominion the full $1,700 monthly rent in July or August after the Housing Authority terminated her assistance. *See* ECF No. 2 ¶¶ 18, 21-26. Further, she does not allege that the lease modification was "calculated" to damage her in any economic relationship not connected to the lease contract. *See, e.g., S.*

---

[33] *See also Macklin v. Robert Logan Assocs.*, 334 Md. 287, 297 n. 7, 639 A.2d 112, 117 (1994) ("One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.").

*Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 851
(D. Md. 2005) (plaintiffs failed to state a claim for tortious
interference because "nothing in the Complaint [suggested] that
the Defendant's alleged statement to one of Plaintiffs'
competitors was calculated to cause damage to the Plaintiffs").
These allegations cannot support a claim of tortious
interference.

b. Misrepresentations at the Trial

Jennings alleges that the Housing Authority "conspired with
Dominion . . . to lie to the District Court . . . in order to
convince the court Ms. Jennings was under a continued lease
obligation to Dominion . . . and was, therefore, in breach of
said lease after the [Housing Authority's] illegal termination
of assistance." ECF No. 2 ¶ 83.  She also alleges that
Dominion, at the "insistence" of the Housing Authority,
"intentionally misrepresented" to the court that Jennings owed
it $1,700 in rent for August and July, and that the Housing
Authority engaged in "bullying and thug tactics" when it
"stepped in and argued a point of law on its own" during the
trial "in order to be sure Plaintiffs lost their right to
negotiate a new lease." *Id.* ¶¶ 80-81.

Because Jennings alleges that Dominion's statement that
Jennings had a "continued lease obligation" to it was a "lie,"
she does not allege that she had a contractual relationship with

23

Dominion at the time of the trial. *See id.* ¶ 83. Accordingly, to the extent that she seeks to assert a claim of inducing a breach of contract against the defendants, it will be dismissed.

With respect to tortious interference claims that are not based on contracts, Jennings's allegations must establish that "the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference." *See Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 629, 831 A.2d 49, 54 (2003) (internal quotations omitted); *Tribalco, LLC v. Hue Tech., Inc.*, CIV. JFM-11-93, 2011 WL 3821074, at *8 (D. Md. Aug. 26, 2011). "Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 657, 650 A.2d 260, 271 (1994) (internal quotations omitted). To state a claim, a plaintiff must plead these unlawful acts, because "a broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *See Ultrasound Imaging Corp. v. Am. Soc'y of Breast Surgeons*, 358 F. Supp. 2d 475, 481 (D. Md. 2005) (*citing Macklin*, 334 Md. at 298, 639 A.2d at 117).

Although Jennings alleges that the Housing Authority conspired with Dominion to lie to the District Court, she does not allege that this wrongful act caused the destruction of her business relationship with Dominion. *See* ECF No. 2 ¶ 83. As Dominion filed suit twice against Jennings for distress of rent before the Housing Authority's actions at the trial, Jennings's economic relationship with Dominion was apparently broken before any misrepresentations occurred. *See id.* ¶¶ 22-26. Further, although she characterizes, in a conclusionary fashion, the Housing Authority's decision to testify at the trial as "bullying and thug tactics," she does not allege how it affected her relationship *with Dominion*. *See id.* ¶¶ 80-81. Jennings's allegations might establish that Dominion's and the Housing Authority's alleged misrepresentations "served as the basis of the Court's finding for Dominion," but she does not allege any facts that would allow the Court to infer that the misrepresentations caused the destruction of her business relationship with Dominion. *See id.* ¶ 82. Jennings has not stated a claim for tortious interference with her economic relationship with Dominion. *See Kaser*, 376 Md. at 629, 831 A.2d at 54.

Because Jennings has not stated a tortious interference claim, her conspiracy claim must also fail. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007)

("'Conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.") (internal quotations omitted).   Count Five will be dismissed.[34]

E. Illegal Termination

The defendants seek dismissal of the remaining claims--Counts One and Two--only as to Scriber and Graziano and Jennings's claim for punitive damages.   *See* ECF Nos. 11-1 at 21, 18 at 2 & n.1.

1. Claims Against Scriber and Graziano

The defendants contend that Counts One and Two should be dismissed as to Scriber and Graziano, because these counts "fail to state any action or omission by" either Scriber or Graziano. *See* ECF No. 11-1 at 20-21.   Jennings contends that the "complaint sufficiently identifies" Graziano "as Chief Executive of the Housing Authority . . . who, in his official capacity, has a duty to 'oversee the actions of the Housing Authority . .

---

[34] Jennings asserts that she has "pled facts sufficient to put Defendants on notice regarding their illegal interference" with her relationship with Dominion, and "any further details regarding [the Housing Authority's] actions may be obtained through formal discovery."   ECF No. 16 at 16.   However, Jennings must state a plausible claim for relief before she is entitled to discovery. *See Iqbal*, 556 U.S. at 678-79, 129 S. Ct. at 1949-50.   Jennings's allegations of tortious interference raise no more than the "mere possibility of misconduct," which is insufficient to survive a motion to dismiss. *See id*. at 679, 1950.

. and holds a supervisory responsibility over'" its employees. *See* ECF No. 16 at 6-7.  By virtue of his position, she argues that Graziano may be liable for the negligent or intentional conduct of his agents. *See id.* at 7.  Also, she contends that Scriber was "acting within the scope of [his] employment relationship" when he violated the plaintiffs' rights.  *Id.*

Counts One and Two assert that termination of Jennings's benefits violated federal law and the Administrative Plan.  *See* ECF No. 2 at 8-12.  Neither claim alleges any misconduct by--or mentions--Scriber or Graziano, nor does the complaint allege that Scriber or Graziano were involved with the initial termination decision or the hearing.  Although, "a public official acting in a discretionary capacity can, under Maryland law, be sued for malicious acts taken in his official capacity," *see Manders v. Brown*, 101 Md. App. 191, 201-02, 643 A.2d 931, 936 (1994), Jennings has not alleged any acts taken by Scriber or Graziano, in any capacity, relevant to Counts One and Two.[35] Counts One and Two will be dismissed as to Scriber and Graziano.

---

[35] In contending that Graziano may be liable for the torts of his agents, Jennings appears to argue that *respondeat superior* applies, whereby "the master or employer may be held liable for the torts of a servant or employee . . . if the employee was acting within the scope of employment when the tortious activity occurred." *See Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 483 (D. Md. 1999) (*citing Sawyer v. Humphries,* 322 Md. 247, 587 A.2d 467 (1991)).  However, Jennings's allegations establish only that Graziano is a Housing Authority employee, albeit a high-ranking one. *See* ECF No. 2 ¶ 5.  She has not

2. Punitive Damages

Counts One and Two remain only against the Housing Authority.  The Housing Authority contends that it is a local government entity, and, accordingly, has no liability for punitive damages.  *See* ECF No. 11-1 at 18-20.  Jennings argues that "[p]unitive damages are available at common law for any 'pure tort' or 'contract related tort.'"  ECF No. 16 at 19.

Local government entities are not liable for punitive damages under Maryland law.  Md. Code Ann., Cts. & Jud. Proc. § 5-303(c)(1) (West 2007); *Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 317, 780 A.2d 410, 431 (2001).  Further, punitive damages are presumptively unavailable from municipalities for violations of federal law absent congressional authorization or compelling public policy reasons. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S. Ct. 2748, 2762, 69 L. Ed. 2d 616 (1981) (holding that "a municipality is immune from punitive damages under 42 U.S.C. § 1983," in part because "an award of punitive damages against a

---

alleged facts to establish that Graziano is an employer.  *See, e.g., id.* ("Upon information and belief Defendant Graziano works in Baltimore City and was so employed at the time of the occurrences set forth herein.").  Accordingly, Graziano has no liability under *respondeat superior* principles for actions of the Housing Authority employees.  *See Cox v. Prince George's Cnty.*, 296 Md. 162, 165, 460 A.2d 1038, 1039 (1983) ("It is . . . fundamental to the concept of vicarious liability under the doctrine of *respondeat superior,* that the tortious actor must be the servant or agent of the one sought to be held liable . . . .").

municipality 'punishes' only the taxpayers, who took no part in the commission of the tort"); *Schultzen v. Woodbury Cent. Cmty. Sch. Dist.*, 187 F. Supp. 2d 1099, 1128 (N.D. Iowa 2002). Neither the FHA, nor the Housing Act, explicitly authorize punitive damage awards against local governments, and Jennings has not identified any reason to depart from the general rule that local government entities are not liable for punitive damages. *See Hispanics United of DuPage Cnty. v. Vill. of Addison, Ill.*, 958 F. Supp. 1320, 1331 (N.D. Ill. 1997) (noting that punitive damages are not generally available against municipalities for FHA violations except when taxpayers participate in the municipal misconduct); *Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120, 1158 (C.D. Cal. 2001) ("Congress has not authorized awards of punitive damages [against municipalities] under the FHA."); *Brooker v. Altoona Hous. Auth.*, 3:11-CV-95, 2013 WL 2896814, at *28 (W.D. Pa. June 12, 2013) (housing authority was immune from punitive damages under the Housing Act and the FHA). The punitive damages claim for Counts One and Two against the Housing Authority will be dismissed.

III. Conclusion

For the reasons stated above, the defendants' motion to dismiss will be granted.


_1/28/14_
Date


_____
William D. Quarles, Jr.
United States District Judge